Filed 10/21/21  In re A.P. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E076562 |
| Plaintiff and Respondent, | (Super. Ct. Nos. J286215, J286216) |
| v. | OPINION |
| G.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Diana W. Prince, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

1

I.

INTRODUCTION

In this juvenile dependency case, the parents were also involved in an ongoing child custody battle in the family court over their teenage girls, L.P. and A.P. (born in 2006 and 2007, respectively). San Bernardino County Children and Family Services (CFS) filed this case under Welfare and Institutions Code[1] section 300, subdivisions (a) and (b) (petition), because G.C. (Mother) absconded with the children in violation of family court orders awarding A.P., Sr. (Father) sole legal and physical custody, and ordering her to return the children to him. In addition, the girls made child abuse accusations against Father and his girlfriend, which the court and CFS later determined were false.

The juvenile court found jurisdiction and ordered the girls removed from Mother and returned to Father's custody. The court then terminated jurisdiction, denied Mother's request for custody under section 361.2, issued family law exit orders addressing custody and visitation, dismissed the case, and entered a final judgment. Mother appeals from the orders and judgment.[2]

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

[2] Father is not a party to this appeal.

Mother contends substantial evidence did not support dependency jurisdiction over the girls. Mother also argues that CFS should not have detained the girls or filed the petition because the family was the subject of ongoing family court proceedings. We reject Mother's contentions and affirm the February 4, 2021 orders and judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Family Court Proceedings*

Since at least 2012, Mother and Father, who never married, were involved in ongoing contentious child custody disputes over the physical custody of the girls. Mother lived in Arizona and Father lived in Barstow.

On May 29, 2015, the family court entered custody and visitation orders awarding sole legal and physical custody of the girls to Father. The court found there was a risk of child abduction and therefore the parents were prohibited from taking the girls out of California without the other parent's permission. The court ordered supervised visitation for Mother. The court ordered that, if the girls refused to return to Father after visiting Mother, law enforcement was authorized to remove the girls from Mother and deliver them to Father's custody, regardless of the girls' objections. The family court also ordered intensive weekly counseling and psychotherapy sessions for the girls to address their high-conflict environment, Mother's attempts to alienate the girls from Father, the girls' conduct of fabricating child abuse allegations against Father, and the girls' polarized viewpoints toward Father.

3

On May 14, 2020, the girls contacted Mother on Instagram through their older half-brother. L.P. texted Mother that she and A.P. were "coming home to live with you forever again." L.P. stated that she had a plan to come home and Mother's husband knew about the plan, "where we got hit by [Father's girlfriend] and call the police for you to come pick us up." L.P. said it had taken her "a long time to pull this off." L.P. told Mother she wanted to make sure Mother would be available to pick up the girls "when our plan works." In response to Mother asking what "bad things have happened to you," L.P. texted that nothing bad had happened other than that Father was trying to get A.P. to side with him instead of Mother. L.P. said she and A.P. were "fine." L.P. explained that the plan was that "we got hit by [Father's girlfriend] and call the police for you to come pick us up." A.P. "was going to get in trouble" and Father's girlfriend "was gonna hit her." Then L.P. was going to call 911 and "[t]hen fight off [Father's girlfriend]." In response to Mother asking what made her want to live with Mother, L.P. texted: "I am tired of seeing the same sunrise and sunset." She added she wanted to see Arizona, be with Mother, and watch "tv shows . . . when we're not supposed to." L.P. wanted to make sure Mother would pick the girls up after they called 911. Mother said to call the police if anything bad happened to the girls. L.P. texted "nothing bad has happened to [A.P.] beside dad trying to have her side with him instead of u." L.P. added that Father's girlfriend hit her in the chest area a month ago, L.P. pushed her off, and Father did nothing about it.

On May 19, 2020, Mother reported to the police that the girls had reached out to her through Facebook Messenger and told her that Father and his girlfriend had been physically and verbally abusing the girls. The police contacted CFS and was advised that Mother called CFS the day before.

The police then contacted Mother and asked her to read to the officer all of the Instagram messages between Mother and the girls. The officer concluded none of the messages established abuse. The messages all indicated that the girls wanted to live with Mother. The police then went to Father's home and met with him and his girlfriend. Father reported that he discovered an Instagram conversation between L.P. and Mother, disclosing that L.P. and A.P. were plotting to run away with Mom and meet her at the police station. Father's girlfriend told the police she was afraid of L.P. because Mother had coached L.P. to get the girlfriend in trouble. The police advised the girlfriend to record the girls when they misbehaved. The police reported the girls showed no signs of abuse. L.P. said she wanted to be with Mother. The police told the girls that making things up was not the way to be with Mother.

On July 11, 2020, Mother reported to the police that during her visitation with her girls, they told her that Father had threatened to shoot Mother if the police attempted to take the girls from him. On July 14, 2020, Mother requested a domestic violence restraining order (DVRO) and custody of the girls based on allegations Father had threatened to kill her, the girls, and the police if the police tried to take his girls from him. The family court granted Mother a temporary restraining order (TRO) and ordered the

5

girls temporarily placed with Mother. When served with the TRO and child custody papers, Father was cooperative and provided Mother with the girls.

On August 5, 2020, the family court denied Mother's request for a DVRO, vacated the TRO, and ordered the girls returned to Father's custody by 2:00 p.m., at the police station. The family court further ordered that the existing family court custody orders awarding Father sole legal and physical custody were to remain in effect.

B. *Section 300 Petition and Detention Hearing*

After the court denied Mother's DVRO request, she contacted CFS and reported that, while she was driving to the Barstow police station to drop off the girls as ordered by the court, the girls told her they were afraid to return to Father's home because they believed he would kill them. L.P. said that she had "old sores" on her back from Father hitting her and Father had previously knocked her unconscious. Mother said she had photos on her cell phone of the girls' facial injuries and their hair pulled out by Father.

Instead of taking the girls to the Barstow police station, Mother took the girls to the Victorville CFS office to be interviewed. L.P. stated that Father hit her so hard on her head that she almost died, and his girlfriend pushed her against the wall. When Father found out L.P. had contacted Mother by Instagram, he went to L.P.'s room at midnight, grabbed her shirt, pulled her off her bed, dropped her on the floor, slapped her so hard that she hit the bedframe, and hit her until she lost consciousness. When A.P. told Father to stop, he slapped A.P. twice in the eye. L.P. said the police showed up at the house but it was too late and the officer would not listen. L.P. told CFS the girls were subjected to

6

ongoing abuse, they did not feel safe in Father's home, and they thought he would kill them. A.P. told CFS that when she heard Father punching, slapping, and hitting L.P., she went to L.P's room, pushed Father, and told him to stop. Father hit and pushed the girls.

When CFS interviewed Father, he stated that the family was engaged in an ongoing custody battle. Father provided the entire Instagram conversation between Mother and the girls, which included L.P. stating the girls were fine and were plotting to get Father's girlfriend in trouble by provoking her to hit them. They then were going to call the police and have Mother pick them up. Father stated that the girls wanted to live with Mother because she promised them cell phones and allowed them to use social media.

After completing the interviews, CFS told Mother that CFS did not have jurisdiction over the girls and that, until advised otherwise, Mother needed to follow the family court orders. When CFS called Mother later that evening and told her Father wanted the girls dropped off that night, Mother said she was driving to Arizona with the girls. CFS told her she was violating court orders. Mother agreed to drop off the girls the following morning at the Barstow police station.

CFS reported that Mother said she took the girls to the Barstow police station on the morning of August 6, 2020, but the girls refused to get out of her car and go with Father. According to Mother, she and Father agreed the girls could stay with a family friend, and Father then left the station to tend to his child. Mother refused to sign the release of liability form required to allow CFS to transport the girls to the family friend's

7

home.  According to Father, Mother never showed up at the police station and, when he tried to call her, she hung up on him.

CFS requested a warrant because of concerns Mother would abscond with the girls again, as she had the day before.  Also, further investigation was needed.  The court denied the warrant because there was an active family law case.  When CFS called Mother and asked her to voluntarily sign over custody of the girls to CFS, Mother said to send the paperwork to her in Arizona.  Mother acknowledged she had the girls and was taking them to Arizona.  CFS told Mother to bring the girls back to Barstow.

The next day, August 7, 2020, CFS filed petitions for juvenile dependency on behalf of the girls under section 300, subdivisions (a) and (b).  At that time, L.P. was 13 years old and A.P. was 12 years old.  The dependency petition alleged the girls suffered or were at risk of suffering serious physical harm (§ 300, subd. (a)) from Father physically abusing L.P. by causing her to sustain sores to her back, swollen eyes, and pain.  A.P. allegedly was at substantial risk of similar harm.  The petition further alleged the parents failed to protect the girls from physical harm and neglect while in Father's care (§ 300, subd. (b)).  While in Father's care, L.P. allegedly sustained physical injuries.  A.P. was thus at risk of sustaining similar harm.  In addition, Father failed to protect the girls from his girlfriend inappropriately disciplining the girls, including pushing them against the wall and hitting them over the head.  The petition further alleged that Mother failed to comply with family court orders and absconded with the girls to prevent them returning to Father's custody, as ordered by the family court.

8

During the detention hearing on August 10, 2020, the juvenile court ordered the girls removed from Mother and Father and placed in foster care based on allegations Mother had absconded with the girls and Father and his girlfriend had abused them.

C. *Jurisdiction and Disposition Hearing*

CFS reported in its August 31, 2020 jurisdiction and disposition report that the girls were doing well in foster care. CFS concluded in its December 11, 2020 addendum report that the petition allegations regarding Father were not supported by the evidence and should be found not true. CFS recommended the court find true the remaining allegations regarding Mother and find jurisdiction under section 300, subdivision (b). CFS further recommended the girls be returned to Father's custody and the court dismiss the petition, with family court exit orders.

During Father's interview in December 2020, Father told CFS that it was well documented Mother had been coaching the girls to make false allegations of child abuse. In 2015, the girls told their therapist that their accusations Father abused them were lies. When CFS asked Father during the interview whether he wanted custody of the girls, he replied, "'I just got questions. If they're to do something to me or [his girlfriend] they may hold animosity towards me and that's a concern.'" When asked again if he wanted the court to give him physical custody, he stated, "'Yes. I am there for my kids.'"

CFS also interviewed the girls in December 2020. A.P. stated that the girls made plans to get in trouble, call the police, and tell their teachers they were being hit at home. They made the plans because they wanted to live with Mother. A.P. said their plans failed. She admitted that all of their allegations and accusations were false. L.P. told CFS during her interview that the girls were not getting hit but then added, "'Nobody knows that it's not true.'" She denied Mother ever told them what to say and maintained that Father said he was going to kill Mother. After the Children's Abuse Center examined the girls, it concluded there was an absence of active injuries, but this did not preclude the possibility of physical abuse.

During the jurisdiction and disposition hearing on February 4, 2021, Mother testified that when she told the girls they had to go back to Father on August 5, 2020, the girls repeatedly stated that Father was going to kill them. Mother therefore took them to the nearest CFS office, which was in Pomona. CFS at that office told her to go to the Victorville CFS office. She went there with the girls and, after they were interviewed, CFS told Mother to take the girls to Father, but then later told her not to take the girls to Father because CFS needed to investigate further. CFS said she could leave with the girls and CFS would call if anything changed.

While driving to Arizona, CFS and the Barstow police watch commander called her and said to bring the girls back to the Barstow police station. Mother returned to the police station the following morning around 5:00 a.m. She waited at the station until after 3:00 p.m., and was then told that the police, CFS, and a judge agreed she could

10

leave with the girls and take them to Arizona but should go to family court the following Monday and file for sole legal and physical custody. As Mother was driving with the girls to Arizona, CFS texted her notice of the detention hearing.

Mother denied she ever told the girls she would buy them things if they lived with her. She also denied telling them to make up abuse allegations against Father. Mother said the girls told her on Instagram about their plan to claim they were abused so they could live with her. She acknowledged she knew she should not have been communicating with the girls on Instagram. Mother testified she did not tell the girls not to do so or not to create such a plan, and did not discourage such conduct.

Mother said her family court history with Father began in 2008. She did not know how many times she filed for custody. In 2015 and 2017, she alleged Father abused the girls. Both times the court did not give her custody, finding there was insufficient evidence. More recently, when the girls contacted Mother by Instagram, they assured her they were fine but told her they had a plan to get in trouble and claim abuse so they could return to her the following Monday. L.P. told her on August 5, 2020, that after Father found out about the May 14, 2020 Instagram communication, he punched and kicked L.P., dropped her on the ground, knocked her unconscious, and then hit her some more. Mother acknowledged there were no apparent injuries, such as bruises.

11

The juvenile court found that Mother was not credible regarding the events leading to the dependency proceedings, noting that on August 5, 2020, the court had denied her request for a DVRO and ordered her to return the girls to Father. She violated the order and absconded with the girls. Also, Mother had a history of trying to alienate the girls from Father and had repeatedly requested custody of the girls, which was denied in 2015 and 2017. In addition, the girls acknowledged their recent allegations that Father abused them were false. The court found Father did not do anything wrong and thus found the allegations against him not true. The court therefore dismissed the petition allegations against him.

The court further found the petition allegations against Mother were true and amended the petition to allege: "That the mother [] has failed to comply with family law court orders and absconded with the [girls]" "to keep the [girls] from the father as ordered by the family law court, which places [them] at risk of harm and neglect." The court therefore found the girls came within section 300, subdivision (b), sustained the petition allegation, as amended, dismissed the petition, and entered family court exit orders. The court ordered the girls removed from Mother and placed in Father's custody. The court further ordered joint legal custody for Father and Mother, and ordered that Father was to have sole physical custody, with the girls' primary residence with Father. The court authorized supervised phone contact and supervised visitation with Mother, but prohibited electronic communication or contact. Any contact with the girls by Mother's husband was also prohibited.

12

III.

APPLICABLE LAW

We review jurisdictional and dispositional orders for substantial evidence. (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.) "In doing so, we view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders. Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment. [Citation.] . . . '"The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." [Citation.]' [Citation.]" (*Id.* at p. 992.)

"A juvenile court may determine that a child is subject to the court's jurisdiction under section 300, subdivision (b)(1) if it finds by a preponderance of the evidence that '[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child.'" (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560-561, quoting § 300, subd. (b)(1).)

Section 300, subdivision (b)(1) requires a finding of "three elements: (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) The California Supreme Court in *In re R.T.* (2017) 3 Cal.5th 622 (*R.T.*), clarified that, as to the first element, section

13

300, subdivision (b)(1) does not require that a parent commit neglect or deserve blame for being unable to supervise or protect the child. There need only be an actual inability to provide the necessary supervision or protection. (*R.T.*, at pp. 624, 625-629; *In re Joaquin C.*, *supra*, 15 Cal.App.5th at p. 561.)

## IV.

### SUBSTANTIAL EVIDENCE SUPPORTS PROTECTIVE JURISDICTION

Mother contends there was insufficient evidence to support a finding of jurisdiction over the girls under section 300, subdivision (b)(1). We disagree.

Under *R.T.*, *supra*, 3 Cal.5th 622, even assuming Mother was not blameworthy for the girls' misbehavior, Mother's inability to supervise and protect the girls supported jurisdiction under section 300, subdivision (b)(1). In *R.T.*, at age 14, R.T. began running away from home and not attending school. She also falsely reported that her mother had abused her. At age 15, R.T. gave birth to a daughter and a few years later she had another child. After R.T.'s mother unsuccessfully attempted to supervise and protect R.T., the mother sought assistance from law enforcement and the county department of children and family services (department). Because of R.T.'s history of falsely reporting that mother abused her, it was difficult for the mother to discipline R.T. The mother therefore arranged for R.T. to live with her maternal grandfather, who had worked with troubled youth. R.T.'s grandparents also had difficulty controlling R.T., who struggled with anger management issues and threw a chair at her grandfather. (*R.T.*, *supra*, at p. 625.) The department filed a dependency petition and the court found jurisdiction under

14

section 300, subdivision (b)(1), on the ground neither the mother nor grandparents could control R.T. The court authorized placement of R.T. in foster care while reunification services were provided. Ultimately, R.T. was placed back with her maternal grandparents. R.T.'s mother appealed the jurisdiction and disposition orders. The Court of Appeal and our Supreme Court upheld the orders. (*R.T.*, *supra*, at p. 625.)

In *R.T.*, the Supreme Court held that section 300, subdivision (b)(1) "authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child." (*R.T.*, *supra*, 3 Cal.5th at p. 624.) The court in *R.T.* explained that a child may be incorrigible without any neglectful conduct on the parent's part. (*Id.* at pp. 629, 633.) In *R.T.*, the evidence suggested that the child in *R.T.* "faced an ongoing risk of harm based on her increasingly self-destructive behavior, behavior that mother simply could not control." (*Id.* at p. 634.)

Mother argues there was no evidence the girls were physically harmed or were at risk of future harm. Unlike R.T., they did not run away from home. Mother maintains there is no evidence of any physical abuse or risk of abuse. While the facts in *R.T.* are more extreme, we nevertheless conclude there was sufficient evidence to support the trial court's jurisdiction order under section 300, subdivision (b)(1). As in *R.T.*, the adolescent girls made false allegations of child abuse against their custodial parent with the intent of being removed from their current home. In addition, although the girls did not run away, they threatened to do so. The evidence also shows that, because of Mother's concerted effort to alienate the girls from Father and her repeated attempts to obtain physical

15

custody of the girls by lying, the girls became complicit in Mother's custody efforts by attempting to carry out a scheme of provoking physical violence by Father's girlfriend.

In addition, because of the girls' alienation from Father and their threats of running away if placed with Father, there was the ongoing risk of physical harm if they ran away, misbehaved in self-destructive ways, or acted out in defiance in response to being placed with Father or in response to his girlfriend's discipline. The evidence shows that before the instant case was filed, the girls on numerous occasions refused to go to Father's home, resulting in the family court authorizing law enforcement to assist in enforcing the court's orders requiring the girls to return to Father's home after visits with Mother. Mother and the girls' conduct leading to, and continuing during the instant proceedings, was consistent with Mother and the girls' history of lying, scheming, and violating court custody orders, with the objective of convincing the court to allow Mother to have physical custody of the girls.

The evidence also supports a reasonable finding that Mother urged and encouraged the girls' lies and schemes of falsely accusing Father and his girlfriend of child abuse. The girls' most recent scheme created a risk of physical violence precipitated by the girls planning to provoke Father's girlfriend to hit L.P.

16

In addition, there was a risk of harm if the girls were left with Mother, because she had a history of not following court orders and the court had twice sustained sexual abuse allegations against her husband, resulting in the court twice removing his adoptive son from him. A.P. told a family law evaluator in December 2019, that she did not want to live with Mother because of Mother's husband. A.P. said she did not like the way he looked at her. While the juvenile court did not state it was basing jurisdiction on this factor, there was a risk of harm to the extent Mother's husband was a known child sex offender and Mother might fail to comply with court orders protecting the girls from her husband because of her steadfast determination to obtain custody of the girls. There was the risk of Mother ignoring or not disclosing sexual abuse of the girls and of discouraging the girls from reporting it.

Mother argues that the girls' misbehavior was not extreme and stopped while they were in protective foster care for six months. Mother maintains that, therefore, at the time of the jurisdiction hearing, there was no substantial risk of significant serious harm, which was required for jurisdiction under section 300, subdivision (b)(1). But the girls had little, if any, incentive to misbehave while in foster care because such conduct would not likely lead to being placed with Mother. The circumstances of living in foster care were quite different than those when the girls were living with Father and visiting Mother. Although the girls did not misbehave while in foster care, this did not demonstrate that they would not do so when returned to Father's custody.

17

In addition, the girls' alienation from Father and their false threats of child abuse interfered with Father's ability to discipline the girls. Such circumstances potentially created a reluctance by Father to discipline the girls out of concern the girls would act out or make false allegations against him. Mother's steadfast determination to obtain custody of the girls also potentially interfered with her ability to discipline the girls, because she was motivated to give in to their desires, even if doing so was potentially harmful to the girls.

We therefore conclude there was substantial evidence that, because of serious alienation issues engendered by Mother over the years, the girls had become incorrigible, disobedient, dishonest, and defiant when it came to being required to live with Father. Even assuming, as Mother claims, she was not the instigator of the girls' misbehavior, Mother did nothing to discourage or prevent it. As in *R.T.*, the court reasonably found the girls were at risk of physical harm because of Mother's failure to provide proper care and supervision by not controlling the girls and effectively disciplining them.

V.

FAMILY COURT AND JUVENILE COURT DUAL JURISDICTION

Mother maintains that, instead of CFS filing a dependency petition and detaining the girls, the better course of action would have been for CFS to return the girls to Father and allow the family court to address Mother's actions. Regardless, we conclude CFS was not required to do so.

"The litigation of custody issues in family court does not estop the juvenile court from reconsidering factually identical issues." (*In re Desiree B.* (1992) 8 Cal.App.4th 286, 293.) "'[T]he mere fact that a litigation is pending between the parents and that an order granting the custody of the children has been made therein does not take away the power of the state nor prevent the exercise of that power under the Juvenile Court Law.'" (*In re Travis C.* (1991) 233 Cal.App.3d 492, 500, quoting *Dupes v. Superior Court* (1917) 176 Cal. 440, 441-442 (*Dupes*); see *In re Desiree B.*, *supra*, 8 Cal.App.4th at pp. 292-293.) This is because the objective and focus of juvenile court is to protect the children.

"When a juvenile court terminates its jurisdiction over a dependent child, it is empowered to make 'exit orders' regarding custody and visitation. [Citations.] Such orders become part of any family court proceeding concerning the same child and will remain in effect until they are terminated or modified by the family court. [Citation.]" (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1122-1123.) Rule 5.695 (a)(7) states in relevant part that at the disposition hearing, the court may "[d]eclare dependency, remove physical custody from the parent . . . and: [¶] (A) After stating on the record or in writing the factual basis for the order, order custody to a noncustodial parent, terminate jurisdiction, and direct that *Custody Order-Juvenile-Final Judgment* (form JV-200) be prepared and filed under rule 5.700," which is what the court did in the instant case. The juvenile court's power under section 362.4 to make custody and visitation exit orders

19

requires it "to make an informed decision concerning the best interests of the child." (*In re John W.* (1996) 41 Cal.App.4th 961, 972.)

In the instant case, the juvenile court was authorized to take protective jurisdiction over the girls, and under section 361.2, terminate jurisdiction and enter exit orders, including child custody and visitation orders. Mother nevertheless argues that CFS's "involvement was inappropriate in view of the family court's involvement and orders," and "CFS should have stood aside," returned the girls to Father, and then let the family court handle the matter.

As CFS notes, Mother's contentions are perplexing in that Mother repeatedly complained that CFS failed to respond and investigate the girls' and her child abuse allegations against Father. Mother also persistently attempted to keep the girls away from Father, including by absconding with them to Arizona and repeatedly accusing Father of child abuse. Mother's counsel argued during the jurisdiction and disposition hearing that, "[g]iven the minors' relationship with [Father] and his documented abusive history, placing the minors with [him] would be detrimental." Furthermore, Mother ultimately benefited from the petition and exit orders because the juvenile court ordered joint legal custody, instead of awarding Father sole legal and physical custody, as previously ordered by the family court.

Because substantial evidence demonstrates there was a serious risk of harm to the girls and need to protect the girls when CFS filed its petition, CFS appropriately filed the instant case in juvenile court and detained the girls in foster care, rather than deferring the

20

matter to the family court to address Mother's actions and immediately returning the girls to Father.

VI.

DISPOSITION

The February 4, 2021 orders and judgment are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

MILLER
Acting P. J.

RAPHAEL
J.